# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

**No. ACM 40374**

––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Logan A. MCLEOD**
Senior Airman (E-4), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 1 May 2024

––––––––––––––––––

*Military Judge*: Michael A. Schrama.

*Sentence*: Sentence adjudged 24 August 2022 by GCM convened at Maxwell Air Force Base, Alabama. Sentence entered by military judge on 15 September 2022: Dishonorable discharge, confinement for 35 years, reduction to E-1, and a reprimand.

*For Appellant*: Major David L. Bosner, USAF; William E. Cassara, Esquire; Megan P. Marinos, Esquire.

*For Appellee*: Colonel Steven R. Kaufman, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Pete Ferrell, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

JOHNSON, CADOTTE, and MASON, *Appellate Military Judges*.

Judge MASON delivered the opinion of the court, in which Chief Judge JOHNSON and Senior Judge CADOTTE joined.

––––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

––––––––––––––––––

MASON, Judge:

Appellant entered mixed pleas at his court-martial. A military judge sitting as a general court-martial convicted Appellant, consistent with his pleas, of: one specification of attempted wrongful possession of a controlled substance (ecstasy) with an intent to distribute; one specification of attempted rape by force; one specification of attempted kidnapping; one specification of attempted kidnapping of a minor; one specification of attempted rape of a child; three specifications of attempted aggravated assault by suffocation upon a person under the age of 16; one specification of attempted production of child pornography; and one specification of attempted distribution of child pornography, all in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880; and one specification of obstruction of justice in violation of Article 131b, UCMJ, 10 U.S.C. § 931b.[1] The military judge convicted Appellant, contrary to his pleas, of: one specification of attempted premeditated murder; one specification of attempted conspiracy to commit rape; one specification of attempted conspiracy to commit kidnapping; one specification of attempted aggravated assault by strangulation upon a person under the age of 16; one specification of attempted aggravated assault by suffocation upon a person under the age of 16; and one specification of attempted assault upon a person under the age of 16, all in violation of Article 80, UCMJ.[2] Appellant was sentenced to a dishonorable discharge, confinement for 35 years, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence.

Appellant raises three issues on appeal: (1) whether the evidence is legally and factually insufficient to support the findings of guilt for attempted murder of "Sarah"[3] and attempted conspiracies to rape and kidnap AB; (2) whether the sentences to confinement are inappropriately severe; and (3) whether the Government violated Appellant's Article 10, UCMJ, 10 U.S.C. § 810, speedy trial right by failing to act with reasonable diligence.[4]

---

[1] Unless otherwise noted, references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of one specification of attempted wrongful possession of a controlled substance (Xanax) with intent to distribute and two specifications of attempted assault upon a person under the age of 16, all in violation of Article 80, UCMJ.

[3] "Sarah" was a fictional name used by law enforcement as explained in the Background section below.

[4] Appellant raises the third issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

We have carefully considered Appellant's allegation of error that he was denied a speedy trial pursuant to Article 10, UCMJ, and find it does not require discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Though not specifically raised by the parties, the court notes that the sentence entered for Specification 10 of the Additional Charge, attempted assault consummated by a battery upon a child under the age of 16, includes a confinement term of five years running concurrent to all charges and specifications. However, the maximum lawful confinement term for this offense was two years. As discussed below, we have reassessed the sentence. Regarding the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and modified sentence.

## I. BACKGROUND

In 2017, JO met BM online and they became friends. In January 2020, the two decided to start dating; BM was Appellant's wife at the time. BM had an open relationship with Appellant, meaning that they both could see other people romantically. JO had a similar relationship with her husband in New York. In June 2020, JO came to visit BM in Montgomery, Alabama. JO met Appellant while staying at his and BM's home. During her week-long visit, JO and Appellant engaged in sexual relations.

In September 2020, BM went to New York to visit JO. The visit did not go well. BM alleged that JO's husband sexually assaulted her and BM stopped talking to JO shortly thereafter. About a month later, Appellant text messaged JO about getting BM's watch returned and JO responded. Within a day or two, their text message conversation turned sexual. They continued to talk through text messages until 27 July 2021, at which time Appellant raised the topics of domination and submissive sex with a particular person. JO responded, "That sounds like a lot of fun honestly." Appellant said, "This is why you need to be my kidnap partner. Lol." Appellant asked JO about kidnapping and whether she would kidnap her own sister. Appellant then stated, "Also, honestly, my ideal kidnap victim would be 14-15." When asked if he would rape them, Appellant said, "Raping them is half the fun[.] The fear in their eyes, their tears, the muffled screams, their useless struggles[.] Taping their mouth and nose shut to watch them panic." After seeing this, JO reported Appellant to the Air Force Office of Special Investigations (OSI).

On 5 August 2021, following a telephone interview, Special Agent JP and another special agent met with JO in New York. Special Agent JP began monitoring JO's and Appellant's text messaging and he advised her to keep talking to Appellant to see where it led.

Appellant and JO continued to exchange messages. They exchanged hundreds of text messages over the next six weeks. During these conversations, Appellant spoke continuously about wanting to kidnap and rape someone. Several of the earlier conversations were focused on determining their victim. JO eventually stated that she knew someone, her friend, AB. JO sent Appellant a picture of AB and after some discussion, Appellant and JO agreed AB would be their targeted victim. They agreed JO would come to Montgomery, Alabama, on 18 September 2021 with AB and they would kidnap and rape her for about ten days before sending AB to JO's home where AB would serve as JO's sex slave.

The planning of AB's kidnapping and rape dominated the conversations between Appellant and JO, and Appellant discussed with extensive detail how he was going to commit these offenses. They also talked about the logistics of where to keep AB while she and JO were in Alabama and how to secure her. They discussed which restraints to use and how to use them. They ultimately decided that they would hold AB captive in an Airbnb lodging house. Appellant instructed JO to make the reservation and paid her $230.00 so she could do so.

As the days moved closer to 18 September 2021, Appellant incessantly detailed how he would rape AB and how excited he was to rape her. While discussing this, he and JO also discussed the possibility of kidnapping a child or a child and mother together so they could rape them. Appellant described with considerable specificity how he wanted to kidnap and rape a child and mother together, and then kill the mother in the presence of the child. Appellant and JO discussed logistics and details about how to make this a reality. JO stated that she had prior contacts. After some exchanges, she put Appellant in touch with a contact whom Appellant believed was a sex trafficker. Appellant and the sex trafficker made a deal where Appellant would pay the trafficker to deliver a mother and a 14-year-old girl to the Airbnb house where they would remain for about two weeks. As it became clear that Appellant and JO were going to be able to kidnap and rape a mother and child and keep them at the Airbnb beginning on 18 September 2021, Appellant decided not to follow through on their initial plan of kidnapping and raping AB.

On 10 September 2021, Appellant met the person he believed was the sex trafficker and paid a down payment of $150.00 for the mother and child, "Sarah" and "Caitlin," respectively.

The conversations continued between Appellant and JO but shifted focus to the logistics and details of how they would commit these crimes against "Sarah" and "Caitlin," the names of the mother and child respectively according to the sex trafficker. All along, this sex trafficker was being portrayed by a law enforcement agent and there never a was real "Sarah" or "Caitlin." Appellant, not aware of the fictitious personas at this time, continued to discuss with

specificity how he would kidnap, restrain, torture, and rape the two. He planned to rape the child, "Caitlin," daily while she was his captive, record each rape, and provide the recordings to the sex trafficker as additional compensation. He also planned to sell the recordings for additional monies to offset what he and JO had already invested in travel and related expenses.[5] Appellant also planned to murder "Sarah." In multiple messages to JO, he expressed a desire to rape and kill a mother in the presence of her child. Specific to "Sarah," Appellant said that he would "snuff" her, meaning suffocate her to death in the presence of "Caitlin."

On 18 September 2021, JO arrived in Montgomery, Alabama, and she met with law enforcement upon arrival. JO was instructed to call Appellant and pretend that "Sarah" and "Caitlin" were escaping after they were dropped off by the sex trafficker. JO made the call to Appellant. Shortly thereafter, Appellant drove to the Airbnb where he was apprehended by law enforcement. In the trunk of Appellant's car, law enforcement found chains, tape, glue, and plastic bags.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019)

---

[5] These expenses included, amongst others, drugs to help keep the victims under control; a camera to record the child rapes; chains, padlocks, and a straitjacket to restrain the mother and child; tape to "mummify" the mother and child; superglue to use on their lips and nose clips to inhibit breathing; and a mask to hide Appellant's identity.

(alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

The National Defense Authorization Act for Fiscal Year 2021 significantly changed how Courts of Criminal Appeal conduct factual sufficiency reviews. Pub. L. No. 116-283, § 542, 134 Stat. 3388, 3611–13 (1 Jan. 2021). "Congress undoubtedly altered the factual sufficiency standard in amending the statute, making it more difficult for a [C]ourt of [C]riminal [A]ppeals to overturn a conviction for factual sufficiency." *United States v. Harvey*, 83 M.J. 685, 691 (N.M. Ct. Crim. App. 2023), *rev. granted*, ___ M.J.___, No. 23-0239, 2024 CAAF LEXIS 13 (C.A.A.F. 10 Jan. 2024). Previously, the test for factual sufficiency required the court, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, to be convinced of the appellant's guilt beyond a reasonable doubt before it could affirm the finding. *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). "In conducting this unique appellate role, we [took] 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (second alteration in original) (quoting *Washington*, 57 M.J. at 399).[6]

The current version of Article 66(B)(i), UCMJ, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.
>
> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

---

[6] The court is mindful that there are contours of the new factual sufficiency review standard that arguably could impact applications of the rule as discussed by our sister service courts. *See United States v. Coe*, __ M.J. __, 2024 CCA LEXIS 52, at *15 (A. Ct. Crim. App. 1 Feb. 2024) (en banc); *Harvey*, 83 M.J. at 685. These contours are not dispositive in this particular case as the evidence does not make determination of factual sufficiency a close call for any of the specifications at issue. Even if we applied our previous factual sufficiency review standard, we would not grant relief as we ourselves are convinced of Appellant's guilt of each of the specifications at issue beyond a reasonable doubt.

(I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(B)(i) (*Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)).

Appellant was convicted of attempted premeditated murder of "Sarah," which required the Government to prove the following elements beyond a reasonable doubt: (1) that Appellant did a certain overt act; (2) that such act was done with the specific intent to kill "Sarah" by means of suffocating her; that is, to kill without justification or excuse; (3) that such act amounted to more than mere preparation, that is, it was a substantial step and a direct movement toward the unlawful killing of "Sarah;" (4) that such act apparently tended to bring about the commission of the offense of premeditated murder; that is, the act apparently would have resulted in the actual commission of the offense of premeditated murder except for a circumstance unknown to Appellant or an unexpected intervening circumstance which prevented completion of that offense; and (5) that at the time Appellant committed the act alleged, he had the premeditated design to kill "Sarah." *See Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*), pt. IV, ¶¶ 4.b, 56.b.(1)(a); *see also Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 1007–08 (29 Feb. 2020).

Appellant was convicted of attempted conspiracy to rape AB, which required the Government to prove the following elements beyond a reasonable doubt: (1) that Appellant did a certain act, that is: provide funding for a lodging rental; (2) that the act was done with specific intent to commit the offense of conspiracy to rape; (3) that the act amounted to more than preparation, that is, it was a substantial step and a direct movement toward the commission of the intended offense; (4) that such act apparently tended to bring about the commission of the offense of conspiracy to rape, that is, the act apparently would have resulted in the actual commission of the offense of conspiracy to rape except for a circumstance unknown to Appellant or an unexpected intervening circumstance which prevented completion of the offense. *See* 2019 *MCM*, pt. IV, ¶¶ 4.b, 5.b.(1); *see also Benchbook*, at 1003–04.

Appellant was convicted of attempted conspiracy to kidnap AB, which required the Government to prove the following elements beyond a reasonable

doubt: (1) that Appellant did a certain act, that is, provide funding for a lodging rental; (2) that the act was done with specific intent to commit the offense of conspiracy to kidnap; (3) that the act amounted to more than preparation, that is, it was a substantial step and a direct movement toward the commission of the intended offense; and (4) that such act apparently tended to bring about the commission of the offense of conspiracy to kidnap, that is, the act apparently would have resulted in the actual commission of the offense of conspiracy to kidnap except for a circumstance unknown to Appellant or an unexpected intervening circumstance which prevented completion of the offense. *See* 2019 *MCM*, pt. IV, ¶¶ 4.b, 5.b.(1); *see also Benchbook*, at 1003–04.

Voluntary abandonment may be applicable in an alleged attempt offense.

> It is a defense to an attempt offense that the person voluntarily and completely abandoned the intended crime, solely because of the person's own sense that it was wrong, prior to the completion of the crime. The voluntary abandonment defense is not allowed if the abandonment results, in whole or in part, from other reasons, for example, the person feared detection or apprehension, decided to await a better opportunity for success, was unable to complete the crime, or encountered unanticipated difficulties or unexpected resistance. . . .

2019 *MCM*, pt. IV, ¶ 4.c.(4).

### 2. Attempted Murder of "Sarah"

Appellant challenges the legal and factual sufficiency of his conviction for attempted premeditated murder of "Sarah." He specifically alleges the evidence was insufficient to prove a specific intent to kill or that he committed an overt act.

#### a. Additional Background

Appellant sent several messages to JO discussing "snuffing"[7] their victim. He wanted to rape two victims together and while doing so, suffocate and kill one of them. He talked about this in terms of two sisters or a mother and daughter. He referred to this desire generally and to various specific individuals. After settling on AB as their victim-to-be, Appellant and JO discussed the possibility of "snuffing" AB when they were done with her. Appellant clarified later that his intention with regard to killing AB was that they would do that "[i]f that's the only option."

---

[7] The context of the messages makes it abundantly clear that when Appellant said "snuffing" he meant killing someone.

When the plan to kidnap and rape "Sarah" and "Caitlin" became concrete and not just conceptualized, on 4 September 2021 Appellant advised the sex trafficker, "I have something really [messed] up in mind if you need the mother gone. But while I'm up for snuff, just know that I do not have any experience with disposal." The next day, the conversation continued on disposal of a dead body. Appellant clarified that he would take care of "Sarah." Specifically, he would suffocate her as not to "make any kind of mess."

Around 0030 on 8 September 2021, Appellant and JO were discussing specifics about their plans to rape "Sarah" and "Caitlin." Appellant said, "This is their first time sharing a client. And their last."

On 8–9 September 2021, Appellant sent JO the following messages:

> 2351: I can't do this

> 2353: I don't know what . . . I've been thinking lately but I think I need to get help. Don't say anything to [the sex trafficker] yet because I'm afraid of what he'll do.

> 2357: Is he gonna kill me for backing out?

> . . . .

> 0000: I think we should back out. Just don't say anything to [the sex trafficker] yet.

After sending these messages to JO, he asked to see the text messages between her and the sex trafficker. After reading their messages, he told JO, "Okay that made me feel a lot better." A few minutes later, he told JO that she sent the sex trafficker the wrong address to the Airbnb house they reserved and added, "[M]ake sure he knows that for the drop."

Later that same day, Appellant and JO talked on the phone. The call was recorded. During that conversation, Appellant told JO that he only sent those messages so he would "have it on the record in case this was a . . . cop setup, basically."

Over the next several days, Appellant and JO continued to discuss the specifics of their plan. On 16 September 2021, Appellant and JO discussed using drugs to subdue "Sarah" and "Caitlin." JO asked Appellant on whom they should use the drugs. Appellant responded, "Mostly the mother. But ['Caitlin'] after we off her mother. She'll probably need it." JO asked, "[A]re we still snuffing her the night before I have to leave?" Appellant said, "Yes. Is that alright[?]" JO then stated, "Yeah just checking! U said ['Caitlin'] woulda need it and I didn't know how long we were planning on keeping her after we kill her mom. . . ."

### *b. Analysis*

The record demonstrates that Appellant formed the requisite specific intent to kill "Sarah" no later than 8 September 2021. Appellant claims that he did not have the specific intent to kill her and that all his talk about this was merely fantasy. The context of the text messages with JO simply do not support that conclusion. While it is arguable that there are some specific exchanges that seem to be geared towards sexual gratification of Appellant and JO, there are many exchanges that are just discussions of logistics of their plan to kidnap, rape, and torture these victims and to murder "Sarah." As such, the context of the messages taken together does not support that Appellant was merely engaging in fantasy. Rather, he had the specific intent to kill "Sarah."

Moreover, the recorded phone calls between Appellant and JO were not sexually charged in any way. Rather, the tone, tenor, and pace of the conversations about the logistics of committing these crimes were as innocuous as would be expected in a conversation between to two people planning a Sunday barbeque. There is nothing about these conversations that support a conclusion that Appellant's assertions about killing "Sarah" were merely fantasy.

Further, Appellant's text message exchanges with the sex trafficker regarding killing "Sarah" were also not merely fantasy as he now alleges. In fact, the conversation was not sexually charged at all. Considering all the circumstances of this case, we find no merit in Appellant's argument that the assertions made to the sex trafficker were merely fantasy. Instead, the record conclusively demonstrates that these assertions were manifestations of his criminal, specific intent to kill "Sarah."

Appellant refers to the 8–9 September 2021 text message exchange, quoted *supra*, arguing he did not have the specific intent to kill "Sarah." However, his own words categorically refute this argument. He wanted a "record" of his intent to back out of the endeavor in case it was a "cop setup." Unbeknownst to him, however, he was being recorded on the phone where he admitted that such messages were essentially false.

As late as 16 September 2021, there is clear proof that Appellant intended to kill "Sarah." He directly agreed that they would be "snuffing" her the night before JO returned home. This statement is also consistent with the other references reflected in the messages about what he would do with the mother/victim when he was done with her.

In addition to challenging the sufficiency of the evidence regarding his intent to kill, he also challenges the sufficiency of the evidence that he engaged in an overt act. The Government did not charge a specific overt act or acts for this offense, nor were they required to. *See United States v. Norwood*, 71 M.J. 204, 206–08 (C.A.A.F. 2012) (citing *United States v. Resendiz-Ponce*, 549 U.S.

102, 107 (2007)).[8] However, the record is replete with evidence of Appellant's overt acts, including but not limited to: Appellant's payment for the Airbnb, providing money to JO to help with her travel to Montgomery, as well as the fact that he traveled to the Airbnb where he believed JO, "Sarah," and "Caitlin" were located. Each act amounted to more than mere preparation and apparently tended to effect the commission of the intended offense. *See* 2019 *MCM*, pt. IV, ¶ 4.c.(2). If not for the fact that "Sarah" was not a real person, but a creation of law enforcement, and if not for Appellant being apprehended at the intended crime scene, the evidence demonstrates that the alleged offense was intended to have been completed. *See* 2019 *MCM*, pt. IV, ¶ 4.c.(3).

Viewing the evidence in the light most favorable to the Government, the military judge rationally found Appellant guilty of attempted premeditated murder beyond a reasonable doubt. Therefore, the finding is legally sufficient. *See Robinson*, 77 M.J. at 297–98.

Regarding the factual sufficiency of this offense, Appellant has made a request for a factual sufficiency review and has asserted a specific showing of a deficiency of proof. However, having given appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence, the court is not clearly convinced that the finding of guilty was against the weight of the evidence. Thus, the finding is factually sufficient. Article 66(B)(i), UCMJ (2024 *MCM*).

### 3. Attempted Conspiracy to Kidnap and Rape AB

Appellant challenges the legal and factual sufficiency of his convictions for attempted conspiracies to kidnap and rape AB. He specifically alleges the evidence was insufficient to prove that he intended to commit these offenses, that he committed an overt act, or that he did not voluntarily abandon the attempted conspiracy.

Appellant argues first, as he did regarding the premeditated murder specification, that his statements were merely fantasies and that he did not believe his fantasy would be realized. However, the evidence shows he had more than just mere fantasies about committing these offenses. Rather, he had the specific intent to kidnap and rape AB. Moreover, he took specific steps to make that intent reality. He encouraged JO to make arrangements to get AB to come to Montgomery. When JO did, he saw AB's messages and proceeded to make detailed logistical preparations for her arrival. Throughout hundreds of pages of text messages, Appellant expressed an unwavering intent to commit these

---

[8] Appellant did not raise at trial or here on appeal any allegation of a deficient specification or lack of notice regarding the nature of this offense, nor did he raise any concern regarding which overt act(s) formed the basis of the offense.

crimes. As noted above, the context of these messages dispels any lack of clarity about this being intent rather than being mere fantasy.

Appellant argues next the record is not clear that Appellant actually paid JO for the Airbnb lodging reservation and therefore the evidence is not sufficient to prove the alleged overt act, that Appellant "provided funding for a lodging rental." The record demonstrates after discussing different locations for committing the offenses against AB, Appellant and JO talked about which Airbnb location to reserve for holding AB captive. Appellant picked one and sent JO a picture with the website link. JO asked, "So do u want me to book this now?" Appellant responded, "As long as you're absolutely sure you can do this." JO stated, "Bet. I'll reserve it now," and asked Appellant to cover the $230.00 downpayment. Appellant said, "Yeah I can send you $230 right now[.] Will you be bringing any restraints?" JO discussed the timing of the reservation payment and told Appellant, "[W]e definitely should book now so it doesn't get snagged." Appellant responded, "Yeah[,] go ahead and book it and then I'll send you the money, if you absolutely need it now. . . ." JO told Appellant, "I just paid the 230. . . ." and gave Appellant her Venmo name so he could send her the money.

On 4 August 2021, Appellant paid JO $230.00 using Venmo and sent JO a screenshot showing the payment. Immediately before and after he sent this screenshot, Appellant sent pictures of the inside of their Airbnb reservation commenting about which room would be the best to keep AB confined.

Our superior court has recognized that in cases of attempt, travel can constitute a substantial step. *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) (citations omitted). In analyzing an attempted larceny conviction, our superior court noted it had "recognized that a substantial step could be comprised of something as benign as travel, arranging a meeting, or making hotel reservations." *United States v. Hale*, 78 M.J. 268, 272 (C.A.A.F. 2019) (footnote omitted) (citing *Winckelmann*, 70 M.J. at 407). Here, Appellant, with the specific, expressed intent to kidnap and rape AB, made lodging arrangements through his co-conspirator to facilitate the commission of these offenses. He specifically paid $230.00 to JO for this purpose. The evidence is legally and factually sufficient to prove an overt act was committed as alleged.

Lastly, Appellant argues that the defense of voluntary abandonment applied to these offenses. We disagree. The defense of voluntary abandonment only applies when,

> the person voluntarily and completely abandoned the intended crime, solely because of the person's own sense that it was wrong, prior to the completion of the crime. The voluntary abandonment defense is not allowed if the abandonment results, in

> whole or in part, from other reasons, for example, the person feared detection or apprehension, decided to await a better opportunity for success, was unable to complete the crime, or encountered unanticipated difficulties or unexpected resistance. . . .

2019 *MCM*, pt. IV, ¶ 4.c.(4); *see also United States v. Feliciano*, 76 M.J. 237, 240 (C.A.A.F. 2017) (reciting the same definition of voluntary abandonment). Here, Appellant's own sense that kidnapping and raping AB was wrong was not the primary or even sole reason he abandoned these offenses. Quite to the contrary, his abandonment was due to his desire to commit those and more severe offenses against others whom he considered to be more appealing victims. After he made the decision to pursue these more appealing victims instead of AB, Appellant noted, AB "will never know the bullet she dodged."[9]

Viewing the evidence in the light most favorable to the Government, the military judge rationally found Appellant guilty of attempted conspiracy to kidnap AB and attempted conspiracy to rape AB beyond a reasonable doubt. Therefore, the findings are legally sufficient. *See Robinson*, 77 M.J. at 297–98.

Regarding the factual sufficiency of attempted conspiracy to kidnap and rape AB, Appellant has made a request for a factual sufficiency review and has asserted a specific showing of a deficiency of proof. However, having given appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence, this court is not clearly convinced that the findings of guilty were against the weight of the evidence. Thus, the findings are factually sufficient. *See* Article 66(B)(i), UCMJ, (2024 *MCM*).

## B. Sentence Appropriateness

### 1. Law

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 n.8 (C.A.A.F. 2006). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record . . . ." *United States v. Fields*, 74 M.J. 619, 625 (A.F. Ct. Crim. App. 2015) (citations omitted). We must also be sensitive to considerations of uniformity and evenhandedness. *United States v. Sothen*, 54. M.J. 294, 296 (C.A.A.F. 2001). While we have significant discretion in determining whether a particular sentence is

---

[9] Though Appellant abandoned kidnapping and raping AB at that time, he did not foreclose the possibility of kidnapping and selling her to the sex trafficker later, saying, "No [AB] for now. He's not comfortable enough with me yet."

appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 148 (C.A.A.F. 2010).

When conducting our review, we not only consider the appropriateness of the entire sentence, but also "must consider the appropriateness of each segment of a segmented sentence." *United States v. Flores*, __ M.J. __, No. 23-0198, 2024 CAAF LEXIS 162, at *7 (C.A.A.F. 14 Mar. 2024).

The President set forth the maximum punishment for an assault consummated by a battery upon a child under 16 years as: Dishonorable discharge, forfeiture of all pay and allowances, and confinement for two years. *See* 2019 *MCM*, pt. IV, ¶ 77.d.(2)(f). An attempt to commit this offense shared the same maximum punishment. *See* 2019 *MCM*, pt. IV, ¶ 4.d.

Where the imposed sentence exceeded the maximum lawful sentence, it materially prejudiced Appellant's substantial rights. *United States v. Beaty*, 70 M.J. 39, 45 (C.A.A.F. 2011). In those circumstances, this court may authorize a rehearing on sentence or if we can, we may reassess the sentence. *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F. 2002).

We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances including the following factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id.* at 15–16 (citations omitted).

If we cannot determine that the sentence would have been at least of a certain magnitude, we must order a rehearing. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000).

### 2. Analysis

In undertaking analysis of the appropriateness of Appellant's sentence, we revisit the full scope of his criminal endeavors in this case. Appellant attempted to conspire with JO to kidnap and rape AB by baiting her into an all-expense paid trip to Montgomery to visit JO's "friend." Upon arrival, AB would be restrained, held captive inside an Airbnb house modified to make it "sound-proof" with blankets and rugs, and repeatedly raped. When discussing these

intended actions, Appellant stated, "I'm really going to enjoy raping her and watching her cry." Later, he said, "I can't wait to hear her muffled screams." He intended to keep AB in this condition for ten days before sending her back with JO to New York where AB was to be in a collar and leash, and serve as a permanent sex slave to JO as well as Appellant when he visited JO.

Appellant's disturbing crimes did not stop with AB. Appellant attempted to kidnap a mother and her 14-year-old daughter with the intent of holding them captive at first separately, then together. He planned to subdue them using ecstasy and rape them repeatedly. With regards to "Caitlin," whom he believed to be a 14-year-old girl, he planned to restrain her using various mechanisms, including a straitjacket, and rape her every day for ten days. He planned to record these offenses and sell them to a person he believed to be a sex trafficker for compensation. He also planned to torture her using a variety of terrible methods centered on impeding her breathing. All the while, he anticipated deriving gratification from her suffering.

In addition to raping "Sarah," who he believed to be the mother of "Caitlin," he planned and attempted to murder her. His plan was to tie "Sarah" and "Caitlin" together, and rape "Sarah" while simultaneously suffocating her. He wanted "Caitlin" to watch as "Sarah" died. He then intended to ejaculate into "Sarah's" "empty husk." After he was finished, Appellant intended for "Sarah's" dead body to remain tied to "Caitlin" for hours to further torment her.

Before arriving on 18 September 2021 at the reserved Airbnb house, Appellant procured several of the items needed to commit these offenses, including restraining mechanisms and a mask. He communicated to JO that she should bring other items. He also told JO to delete her text messages because he knew they were incriminating.

For his crimes, Appellant was sentenced to a dishonorable discharge, 35 years of confinement (consisting of multiple segments that ran concurrent to the segment of 35 years of confinement for attempted premeditated murder), reduction to the grade of E-1, and a reprimand.

The depravity demonstrated by Appellant is rarely seen in the military justice system. He argues there were no real victims because AB was not harmed, and "Sarah" and "Caitlin" were fictitious. While it is true "Sarah" and "Caitlin" were not real people, the salient fact is that Appellant did not know that. As Appellant himself expressed during his guilty plea inquiry, "I was unaware until after my apprehension that 'Sarah' was a fictional person." The evidence demonstrates Appellant attempted to commit these crimes on real people and his sentence is not inappropriately severe regardless of the fact that "Sarah" and "Caitlin" were not real. During the sentencing phase of the trial, Appellant

presented testimony from his parents, a written and verbal unsworn statement, and various photos.

We have assessed the appropriateness of Appellant's sentence, considered this particular appellant, the nature and seriousness of the offenses, his record of service, and all matters contained in the record, including his childhood abuse. As a whole, Appellant's sentence is not inappropriately severe.

This does not end our inquiry, however. We are also charged with reviewing each segment of the sentence to ensure its lawfulness and appropriateness. We note that this review revealed that Appellant's sentence for Specification 10 of the Additional Charge, attempted assault consummated by a battery upon a child under the age of 16, included a confinement term of five years—an unlawful confinement term as the maximum allowable for this offense was two years. As the imposed sentence for this segment exceeded the maximum lawful sentence, it materially prejudiced Appellant's substantial rights. *Beaty*, 70 M.J. at 45. Thus, we may order a rehearing or, if we can, reassess the sentence.

We are able to reassess the sentence. The military judge sentenced Appellant for his various attempted aggravated assaults and the attempted assault consummated by a battery upon a child under the age of 16 offense to be between three and five years of confinement for each. That he sentenced Appellant to the higher end of that range for this offense indicates that he viewed this offense as relatively severe compared to those other offenses. Viewing the evidence in the case, this is unsurprising. The details of Appellant's attempt to assault a 14-year-old child in this manner stands out as particularly aggravating in a case already quite severe in nature. Considering all the matters of record, we are confident that the military judge would have adjudged the maximum term of two years of confinement running concurrently with all charges and specifications. We therefore reassess the sentence to reflect that confinement term.

With the sentence modified, we revisit the appropriateness of the sentence, including each segment of the modified sentence. After carefully considering the particular appellant, the nature and seriousness of the offenses, his record of service, and all matters contained in the record, Appellant's sentence is not inappropriately severe.

### III. CONCLUSION

The findings as entered are correct in law and fact. We reassess the sentence to confinement for Specification 10 of the Additional Charge to two years, to run concurrently with all charges and specifications. The remaining segments of the sentence are unchanged. The findings and sentence, as reassessed, are correct in law and fact, and no additional error materially

prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence, as reassessed, are **AFFIRMED.**

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court